IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


JOSEPH PACITTI and BEN      )
CINQUEGRANA,              )
                                  )      Civil Action No. 05-317
             Plaintiffs,   )
                                  )
      vs.               )
                                  )
RICHARD E. DURR,        )
                                  )
             Defendant.   )


## MEMORANDUM OPINION


CONTI, District Judge

      In this memorandum opinion, the court considers the motion for summary judgment

(Doc. No. 77) filed by defendant Richard E. Durr ("defendant" or "Durr") with respect to all

claims against Durr asserted by plaintiffs Joseph Pacitti ("Pacitti") and Ben Cinquegrana

("Cinquegrana") (collectively "plaintiffs"). In the complaint, Pacitti asserted state law claims

against Durr for ethnic intimidation under 42 PA. CONS. STAT. § 8309, defamation of character,

invasion of privacy and civil rights violation under 42 PA. CONS. STAT. § 8309.[1] Cinquegrana

asserted a state law claim against Durr for defamation of character. Jurisdiction over these

claims arises under 28 U.S.C. § 1332, which relates to diversity jurisdiction. After considering

---

[1]In the briefing related to the motion for summary judgment and throughout the case, Pacitti has treated the claims for ethnic intimidation and civil rights violation as one claim. Pacitti alleges that both claims are brought pursuant to 42 PA. CONS. STAT. § 8309. As Pacitti has treated these claims as one claim, the court will do so in this opinion. The court's analysis relating to the ethnic intimidation claim will be the same for the civil rights violation claim.

the joint concise statement of undisputed material facts ("joint statement" or "J.S.") and the other submissions of the parties, viewing all disputed facts in favor of plaintiff and drawing all reasonable inferences in favor of plaintiff, defendant's motion for summary judgment will be granted.

### *Factual Background*

Seapointe Condominium Association, Inc. ("Seapointe" or the "Association") is located in Key Colony Beach, Florida. (J.S. ¶ 1.) Seapointe consists of fifteen condominium units. (Id.) Pacitti, and defendant, Durr, both own condominiums at Seapointe. (J.S. ¶¶ 4, 8.) Cinquegrana owns a construction business called Professional Construction Management, Inc. (J.S. ¶ 7.) Cinquegrana's company was hired by Pacitti to remodel Pacitti's condominium. (J.S. ¶¶ 28-29.) Cinquegrana's company was also retained by other Seapointe owners to perform certain renovations and other projects. (J.S. ¶ 43)

Durr was appointed to Seapointe's board of directors in March 2002. (J.S. ¶ 9.) In March 2003, Durr was appointed president of the board of directors. (Id.) Durr's presidency ended effective November 1, 2005. (Id.) During the time period in question, in addition to Durr, the members of the board of directors included, among others, Pat Egan ("Egan") and Ken Luneack ("Luneack").

During Durr's presidency, Durr became aware, by reviewing certain public records, that Pacitti had mortgaged his condominium unit and that the Internal Revenue Service had placed a lien against Pacitti's condominium unit. (Id.)

**Seapointe Condominium Bylaws**

Every Seapointe condominium owner[2] is subject to the Seapointe Declaration of Condominium and the related bylaws (the "bylaws"). (J.S. ¶¶ 2, 3.) Among other things, the bylaws provided that each owner of a Seapointe condominium is "obligated to pay the common charges assessed by the Board of Directors." (Pacitti Dep. Ex. 1 at RD00160.) In the event that an owner does not pay the common charges, the owner is in default. (Id.) In the event of default, the board of directors may initiate an action to collect the common charges and foreclose a lien for nonpayment of the charges. (Id.) The bylaws further provide that "[n]o owner shall make any structural addition or alteration to his residential unit without the prior written consent of the Board of Directors." (Id. at RD00162.) The bylaws grant a person authorized by the board of directors, and others, the

> right of access to each residential unit from time to time during reasonable hours in order to maintain, repair, or replace any common elements in them or accessible from them, or to make emergency repairs necessary to prevent damage to common elements or to any other residential unit or units, or to correct any condition in violation of any mortgage secured by any residential unit. Requests for access shall be made in advance and shall be set for times convenient to the owner. Notwithstanding the preceding sentence, in the event of emergency, right of access shall be immediate, and shall operate regardless of whether the owner is present.

(Id.)

With respect to the purpose and use of the Seapointe condominiums, the bylaws provide in pertinent part:

---

[2]Throughout the course of this litigation and within the bylaws, Seapointe condominiums owners have been referred to as both "owners" and "residents." For ease of reference, the court will refer to condominium owners as "owners"throughout this opinion.

11.01.    Residential units shall be used and occupied by their respective owners as private single-family residences for themselves, their families and social guests, and for no other purpose, other than where specific exceptions are made in this Declaration.

11.02.    In order to provide for a congenial occupation of the Condominium and for the protection of the value of the residential units, the use of the property shall be restricted in accordance with the provisions of this Article.
...
11.023.    No nuisance shall be allowed upon the Condominium property, nor shall any practice be allowed which is a source of annoyance to residents or which will interfere with the peaceful possession and proper use of the Condominium property by residents.
...
11.025.    No immoral, improper, offensive or unlawful use shall be made of the Condominiums [sic] property nor of any residential unit or boat slip or any portion of either.

11.027.    Reasonable regulations concerning use of the Condominium property, and especially the common elements and limited common elements, may be promulgated by the Condominium Association, which includes, without limitation, a prohibition upon the keeping of pets.  Copies of all regulations shall be furnished to all owners.

(Id. at RD00118-19.)  On May 21, 1988, the Seapointe board of directors adopted new rules related to rentals at Seapointe.  The rental rules provide in relevant part:

All rentals, leases, and transfers require notification to, and approval of, the Board of Directors.  Notice shall include the following:
a. Names and addresses of ALL parties to occupy the premises.
b. Dates of occupancy.
c. Copy of the rules signed by the lessee, renter, or transferee.
...
Rentals, leases and transfer shall be limited to three (3) per calendar year, none of which shall be for a period of less than one (1) month.

(Pacitti Dep. Ex. 28) (emphasis in original).  Additionally, the condominium association requests that owners notify either the building manager or the board when owners have guests in the

building. (Luneack Dep. at 12.) Although the notification about guests is not a requirement, it is a courtesy that owners extend to their Seapointe neighbors and the building manager. (Id.)

With respect to officers of the board of directors, Article VII of the bylaws provides that "[t]he affairs of [Seapointe] are to be managed by a President, Vice President, Secretary and Treasurer who will be accountable to the governing board." (Pacitti Dep. Ex. 1 at RD00149.) The bylaws further designate the powers and duties of the board of directors. Article II, section 2.03 provides:

> The board of directors shall have the powers and duties necessary for the administration of the affairs of [Seapointe], and may do all such acts and things as are not by law, by the Declaration, or by these Bylaws directed to be exercised and done by the owners. The powers and duties to be exercised by the Board of Directors shall include, without limitation, the following:
>
> (a) The maintenance, repair, replacements, cleaning, and sanitation of the common elements;
> (b) The determination, assessment, and collection of funds for common expenses, and payment of such expenses;
> (c) The adoption, distribution, amendment, and enforcement of regulations governing the use and operation of [Seapointe] and the use of the common elements, subject to the power of a majority vote of the owners to change any such regulations;
>
> ....
>
> (e) The maintenance of accounting records, in accordance with law and generally accepted accounting principles, which records shall be made available for inspection by owners and mortgages at all reasonable times;
> (f) The authorization and prosecution, in the name of [Seapointe], of any and all actions and proceedings deemed necessary or appropriate in furtherance of the interest of owners generally, including suits to foreclose liens for nonpayment of assessments or to recover money judgments for unpaid assessments;

(Id. at RD001545.) Article III of the bylaws relating to officers provides:

> The president shall be the chief executive officer for the Association. He shall preside at all meetings of the Board of Directors and of owners. He shall have all general powers and duties that are incident to the office of President of a Florida corporation not for profit including, without limitation, the power to appoint

5

committees from among the owners from time to time as he may deem
appropriate in order to assist in conducting the affairs of the Association.

(Id. at RD00157) (emphasis added).

**Payment of Assessments and Other Condominium Fees**

On many occasions, Pacitti failed to pay timely his assessment fees as required by the
bylaws.  (J.S. ¶¶ 11-15 .)  By way of delinquency notices, the Association advised Pacitti that his
1986 second quarter maintenance fees were delinquent.  (Pacitti Dep. Ex. 8.)  At the time the
1986 second quarter delinquency notices were issued, Pacitti owed the Association more than
$8,000.  (Id.)  On October 20, 1986, an Association representative sent Pacitti a letter indicating
that Pacitti was delinquent in paying certain assessment fees.  (Pacitti Dep. Ex. 13.)  The October
20, 1986 letter indicated that Pacitti's units and boat slip fees were in arrears in the amount of
$3,888.30.  (Id.)  Pacitti does not dispute that he owed these funds and that they were past due.
(Pacitti Dep. at 71-72.)

The following year, Pacitti was provided with delinquency notices relating to the 1987
fourth quarter.  (Pacitti Dep. Ex. 21.)  The 1987 fourth quarter delinquency notices indicated that
Pacitti was in arrears for more than $5,000.  (Id.)  Pacitti does not dispute that he owed these
funds and that they were past due.  (Pacitti Dep. at 82-83.)

As a result of Pacitti's failure to pay timely the fees associated with his condominium, the
Association, in 1987, commenced a lawsuit against Pacitti.  By letter dated November 4, 1987,
counsel for the Association attempted to settle the lawsuit by requesting that Pacitti pay forthwith
the past due assessments for the second, third and fourth quarters of 1987.  (Pacitti Dep. Ex. 22.)
Pacitti does not dispute that these fees were past due.  (Pacitti Dep at 83-84.)  Instead, Pacitti

asserts that he failed to pay the assessments because he was in the midst of a lawsuit with the Association during this time frame.  (Pacitti Dep. at 84.)  On February 8, 1988, Pacitti paid the past due assessments.  (Pacitti Dep. at 85.)  On March 24, 1988, the Association voluntarily dismissed its action against Pacitti.  (Pacitti Dep. Ex. 25.)

On October 1, 2002, the Association filed a claim of lien for condominium assessments against Pacitti's condominium.  (Pacitti Dep. Ex. 35.)  The lien resulted from Pacitti's failure to pay maintenance fees for the 2002 third and fourth quarters as well as other special assessments. (Id.)  The lien was in the amount of $19,279.22.  (Id.)  The lien was recorded in Monroe County, Florida.  (Id.)  Pacitti does not dispute that he owed these assessments and that they were past due.  (Pacitti Dep. at 93-94.)

On May 6, 2003, Durr wrote a memorandum to Seapointe owners addressing various matters.  One of the matters raised was that Pacitti had not "sent in his second quarter assessment, which was due on April 1st."  (Pacitti Dep. at 99.)  Pacitti does not dispute that his 2003 second quarter assessments were past due.  (Pacitti Dep. at 99.)

By letter dated April 15, 2004, Durr advised Pacitti that he was one of three owners who had not yet paid the 2004 second quarter assessments.  (Pacitti Dep. Ex. 59.)  Durr's letter indicated that the Association relied on the payment of assessment fees in order to pay liabilities incurred by the condominium association. (Id.)  The letter further indicated that the Association board members had paid the third and fourth quarter assessments in advance to help the Association with cash flow shortages.  (Id.)  Durr's letter reminded Pacitti that assessments are due on the first day of each quarter and requested Pacitti to remit promptly his payment.  (Id.) The letter was copied to David Rogel ("Rogel"), counsel for the Association.  Pacitti does not

dispute that he had not paid his 2004 second quarter assessments. (Pacitti Dep. at 116.) Pacitti did not know why his assessments were not paid, but asserted that his secretary generally handled those matters. (Pacitti Dep. at 116-17.)

On May 5, 2004, Durr again sent Pacitti a letter regarding the 2004 second quarter assessments and other assessment fees. (Pacitti Dep. Ex. 62.) The May 5, 2004 letter indicated that Pacitti was the only owner who had not paid the 2004 second quarter assessments. (Id.) The letter detailed a past due assessment related to the purchase of hurricane shutters. (Id.) Durr's letter indicated that Pacitti owed the Association $7,285.09 plus interest for the cost of the hurricane shutters. (Id.) Durr informed Pacitti that if the hurricane shutter assessments and regular assessments were not received by June 1, 2004, the Association would proceed to place a lien against Pacitti's condominium. (Id.) Pacitti does not dispute that as of the date of that letter he owed the amounts as set forth in Durr's May 5, 2004 letter. (Pacitti Dep. at 118-119.)

By letter dated May 27, 2004, Durr informed Pacitti that because he had not paid either his second quarter assessment, which was nearly 60 days past due, or his hurricane shutter assessment, the Association would pursue a lien against Pacitti's condominium. (Pacitti Dep. Ex. 64.) Pacitti does not dispute that he owed the assessments as outlined in the May 27, 2004 letter. (Pacitti Dep. at 120.) On August 10, 2004, the Association placed a lien against Pacitti's condominium in the amount of $7,421.37. (Pacitti Dep. Ex. 72.) The lien was filed in Monroe County, Florida. (Id.) On August 26, 2004, the counsel for the Association forwarded a copy of the lien to Pacitti. (Id.)

On August 24, 2004 Durr wrote a memorandum to Seapointe owners updating them on various items of interest related to Seapointe. (Pacitti Dep. at 130.) At the end of the

memorandum, Durr advised the owners that: "[w]e are not long on funds because Pacitti has still not paid for shutters or his third quarter assessment." (Pacitti Dep. at 130.) Pacitti admits that as of the date of that letter he had not paid for the shutters and did not dispute that his third quarter assessment was delinquent. (Pacitti Dep. at 130.)

Durr wrote Pacitti a letter dated June 21, 2004. (Compl. Ex. D.) The letter was copied to Egan, Leneack and the counsel for the Association. The June 21, 2004 letter advised Pacitti that shutters will be installed on all windows and collection will proceed in connection with the installation, as each owner would be assessed for the costs of the installation. Durr's letter also requested that Pacitti pay his delinquent second quarter assessments. The letter informed Pacitti that his delinquency in paying assessments forces other owners to advance assessments to assist Seapointe with cash flow shortages. Finally, the letter requested Pacitti to cease renting his unit and advise either the board or Jerry Dieguez ("Diguez"), Seapointe's building manager, of any guests.

On September 18, 2004, Durr wrote a memorandum to Seapointe owners again updating them on various items of interest. (Pacitti Dep. at 132-34.) In this memorandum, Durr wrote:

> Financially, we are holding our own, even though one of owners now owes more than $10,000 in assessments. This shortfall was covered by the board paying entire year's assessments in the second quarter and a couple of other good sports sent in two checks in the second quarter. However, unless this money is collected soon, another payment by someone will be necessary. Liens have been placed and foreclosure will take place in due course with the legal fees that are adding up.

(Pacitti Dep. at 134.) Pacitti does not dispute that he owed more than $10,000 in assessments at the time of the writing of the September 18, 2004 memorandum. (Pacitti Dep. at 134.)

**Pacitti's Condominium Renovations**

During the fall of 2004, the Association learned that Cinquegrana's company was remodeling Pacitti's condominium. (Pacitti Dep. Ex. 77.) By letter dated October 21, 2004, Durr requested that Pacitti direct Cinquegrana to provide the board of directors with a plan related to the "Scope of Work" to be completed. Durr informed Pacitti that Cinquegrana's company was free to begin work prior to submitting the plan, but requested that the plan be forwarded to the board of directors for approval. Durr's letter also requested that Pacitti pay his past due assessment fees so that other owners would not have to pay extra amounts in an effort to conduct condominium association business. Finally, the letter reminded Pacitti that his 2004 fourth quarter assessments were past due and requested that Pacitti pay those amounts. (Id.)

On November 29, 2004, Durr wrote Cinquegrana a letter relating to the work Cinquegrana was performing on Pacitti's condominium. (Pacitti Dep. Ex. 80.) The letter informed Cinquegrana that the board of directors had become aware that Cinquegrana was hired to do work that was more extensive than originally anticipated. (Id.) Durr's letter provided in pertinent part:

> This letter will confirm our conversation with you this A.M., regarding the remodeling of Unit 203 at Seapointe.
>
> First, it is vital that Joe Pacitti write to the Board requesting permission to remodel and outline his intentions with drawings for any complicated work. Normally, we can do this verbally when the work consists of redoing existing rooms, etc. However, we know from the sketch you gave Pat Egan on Saturday, November 27, that Joe intends to add a fourth bath and squeeze in another den/sleeping room. Under these conditions, a letter outlining the reasons for such extensive changes is required.
>
> Second, I verbally gave you permission, pending receipt of Joe's letter, to move forward with the construction on the kitchen and existing bathrooms, as the Board

has no reason to be concerned about these changes, as many other owners have done it the past two or three years.

Third, however, I specifically withheld permission for you to do anything involving the construction, plumbing, rewiring, etc., of any new rooms and specifically a new bathroom. We also insist that any work on the additional den/sleeping room be curtailed. If any work progresses in these areas, our attorney will file an injunction.

The Board understands that, although Mr. Pacitti did not request approval from the Board in a timely manner, you and your crew need to make a living, so we have allowed the remodeling of the old kitchen and baths.

The contents of this letter outlines the essence of our conversation, and we expect you to comply fully with this directive.

(Pacitti Dep. Ex. 80.) The counsel for the Association also wrote a letter to Pacitti addressing the renovations to his condominium. The counsel's letter provided:

I have been advised that you are altering the interior of your unit without approval of the Association. Article XVIII, Section 18.01, states that no residential unit owner may make any structural modifications or alterations to a unit or to its water, gas, electrical, mechanical, plumbing or air conditioning equipment or utilities without the consent of the Association. As I understand it, you are attempting to add a bathroom and a separate room, which may be another bedroom or a den. The Association has not consented and will not consent to such an alteration. Your failure to obtain approval in advance and any effort to complete the work will be met with appropriately legal action.

(Pacitti Dep. Ex. 81 at 1)

During the time that Cinquegrana was performing work on Pacitti's unit, Durr and Egan went to Pacitti's unit to speak with Cinquegrana. Cinquegrana indicated the Durr came to Pacitti's unit and walked around. (Cinquegrana Dep. at 44.) Durr and Egan confronted Cinquegrana about performing the unapproved work. Durr again advised Cinquegrana that if the work continued the board would pursue an injunction. (Id.) Cinquegrana did not indicate that he

thought there was anything unusual about Durr seeking him out in Pacitti's unit. (Id. at 45.) Cinquegrana never asked Durr to leave Pacitti's unit. (Id.)

In a memorandum requesting a December 3, 2004 special emergency meeting, Durr informed the owners of Seapointe about a conversation that he previously had with Cinquegrana and updated owners on the status of Pacitti's renovation dispute. (Compl. Ex. D.) The board of directors attempted to contact Cinquegrana and stop him from performing unapproved work on Pacitti's unit. (Cinquegrana Dep. at 41.) Durr indicated that he had prohibited Cinquegrana from performing certain work on Pacitti's unit until Pacitti obtained board approval for the renovations. Durr informed Cinquegrana that if Cinquegrana continued to work beyond the conditional approval granted by the board of directors, the board would file for an injunction. Cinquegrana told Durr to get the injunction right away. (Id.) Cinquegrana explained that he had a contract with Pacitti to perform certain work. Cinquegrana would need an injunction to excuse him from performing his contract with Pacitti. (Id. at 41-42, 44.)

In a letter dated February 4, 2005, Durr, Egan and Luneack, on behalf of the Seapointe board of directors, wrote to Pacitti and Cinquegrana. (Compl. Ex. D.) The February 4, 2005 letter related to complaints the board had received relating to renovations of Pacitti's unit. The letter generally addressed the cleanliness of bathrooms, surrounding areas and dumpsters used by Cinquegrana's employees. The letter also discussed concerns about the renovations and requested Pacitti to explain his plans to address the situation. (Id.)


**Damage to Seapointe Elevator**

On January 25, 2005, the board of directors wrote a memorandum to Seapointe condominium owners updating them about certain issues at Seapointe. (Compl. Ex. D.) The memorandum was signed by Durr, Egan and Luneack. The memorandum addressed the possibility of upcoming renovations to the elevator. The memorandum indicated that the Seapointe elevator was worn prior to renovations on Pacitti's unit and noted that scratching and bumping the elevator during the renovations exacerbated the problem. The memorandum further stated that the board intended to pursue reimbursement for repairs from both Cinquegrana and Pacitti. The memorandum also noted that Pacitti was delinquent in paying his 2004 assessments and informed condominium owners that as a result of Pacitti's delinquency, three board members and one condominium owner paid their assessments in advance to help Seapointe.

In the letter dated February 4, 2005, sent on behalf of the board of directors to Pacitti and Cinquegrana, the condition of Seapointe's elevator was addressed and it was noted that "the cost of refurbishing th[e] elevator will have to be negotiated between [Pacitti], [Cinquegrana] and the Association." (Compl. Ex. D.) The board of directors again addressed the issue of damage to the elevator in a January 21, 2005 letter directed to Cinquegrana. (Compl. Ex. F.) In that letter, the board indicated that Cinquegrana and his employees had scratched the door and door frame of the elevator. The letter further indicated that other parts of the elevator were scratched as well. The board informed Cinquegrana that several witnesses saw Cinquegrana or his employees damage the elevator. The letter explained that the board expected Cinquegrana to contribute to the cost of repair. On February 10, 2005, Cinquegrana responded to the board's letter and indicated that his employees and he did not use the elevator when moving steel items.

Cinquegrana suggested that witnesses may be confusing Cinquegrana's workers with those workers who were performing renovations on Durr's unit or one of the other units.  (Id.)

**Pacitti's Condominium Guests**

Pacitti does not deny that he had many guests.  Pacitti could not recall the names of some of the individuals who had stayed in his unit over the years.  Pacitti could not recall how many guests he had in one year.  Although Pacitti had many guests, he vehemently denied ever renting his unit. (Pacitti Dep. at 34.)  Pacitti also denied ever informing either the building manager or the board of directors when he had guests stay at his unit.  (Id.)  Pacitti claimed that no other owner notified either the building manager or the board of directors when they had visitors.  (Id.)  Pacitti was unable to identify any owner to which his assertion applied.  (Id.)

Dieguez testified that Pacitti had numerous guests stay at his unit.  (Dieguez Dep. at 10-11.)  Dieguez had problems with Pacitti's guests on more than one occasion.  On the first occasion, Dieguez informed a number of Pacitti's guests that they could not drink beer at the pool.  (Id. at 11-12.)  Dieguez explained that should the guests' beer bottles fall, the broken glass could cause injury to another person. (Id. at 12.)  Dieguez requested that the guests remove their bottles.  Later, the wind caught the beer bottles and caused the bottles to fall to ground and break.  Egan found the broken glass and reported the issue to Dieguez.  (Id.)

On another occasion, one of Pacitti's guests told Diguez that he was renting Pacitti's condominium.  (Id. at 12-13.)  This guest demanded that certain equipment in Pacitti's condominium be repaired because the guest had paid good money to stay in Pacitti's unit.  (Id. at 13.)  Dieguez explained that he had previously ordered a part for the equipment.  (Id. at 12-13.)  Dieguez also remembered walking in on two individuals having sexual intercourse in Seapointe's

pool.  (Id. 23, 25.)  Dieguez recognized the individuals as being two of Pacitti's guests because he had previously seen the individuals driving Pacitti's van, parking behind Pacitti's van and sitting on Pacitti's condominium porch.  (Id. 21-22, 25-26.)

Pacitti did not deny that his guests may have committed the acts, but rather asserted that other owners' guests have probably done the same thing.  (Pacitti Dep. at 37-38.)  Pacitti further stated that if he had known who committed the acts he would have addressed the individuals himself.  (Id. at 37-38.)

In an unrelated incident, Dr. Luis Galainena ("Dr. Galainena") while visiting his friend, Dr. Enrique Lavernia ("Dr. Lavernia"), at Seapointe, witnessed some young people in Seapointe's pool late one evening. (Dr. Galainena Dep. at 13-14).  While in the pool, one of the young women pulled down her bikini top and exposed herself to the other people in the pool.  (Id. at 15.)  Dr. Galainena did not see these individuals engage in any sexual act.  (Id.)  The morning after this incident, Dr. Galainena told Dr. Lavernia that he witnessed someone being naked in the pool.  (Dr. Lavernia Dep. at 9.)  Some time after that incident happened and while attending a party, Dr. Galainena told other individuals that he had witnessed someone being naked in the pool.  Mario DiGennaro ("DiGennaro"), a former Seapointe condominium owner, and Dieguez were present for the conversation.  (Id. Dep. 10-11.)  During this conversation, Dr. Lavernia told DiGennaro that Dr. Galainena witnessed someone exposing themselves in the pool.  (Id. Dep 10-11.)  Dr. Lavernia did not know with whom the subject individuals were staying.  (Id. at 12-13.)  Dr. Lavernia told DiGennaro that he wanted this type of behavior to stop and DiGennaro agreed to speak with the individuals that were involved. (Id. at 11.)

When Dieguez heard about the incident, he reported the matter to the board of directors. (Dieguez Dep. 10.)  Dieguez could not recall whether he told Durr or Egan, but he was certain that he reported the matter to the board.  (Id. Dep. at 30.)  Dieguez did so because Dr. Lavernia was upset about the incident.  Dr. Lavernia indicated that his grandchildren and nephews visited him at Seapointe.  (Id. at 30-31.)  Dr. Lavernia did not want the children to witness that kind of an event.  (Id.)  When reporting this incident, Dieguez told Durr that "Mr. Lavernia was mad that there was people downstairs having sex under his balcony."  (Id. at 31.)

DiGennaro  remembers that Dr. Lavernia told him that there was someone having a party one night and that one of the party guests was nude.  (Digennaro Dep. at 12.)  DiGennaro recalled that Dr. Lavernia heard about the party and the nudity from someone else. (Id.)

After receiving a number of concerns about Pacitti and his guests, the counsel for the Association wrote a letter to Pacitti.  The counsel's letter stated in part:

> I am also advised that you are renting your unit in violation of your restrictions on rentals and occupancy.  Article XI, Section 11.02a limits rentals, leases and transfers to three (3) per calendar year, none of which will be for a period of less than one (1) month.  There is a further limitation on occupancy by anyone in absence of the owner and precludes any efforts to get around the rental restrictions.  As I understand it, you are allowing your unit to be rented for less than one month and have exceeded the rentals per calendar year allowed. Notwithstanding any suggestion you may make that the occupancies are not rentals, evidence to the contrary makes it clear that you are violating these provisions.  In addition to violating these provisions, the persons who have been renting your unit have caused disturbances and have acted indecently, including one incident where those occupying your unit were having sex in the pool. Further efforts on your part will also lead to legal action.

(Pacitti Dep. Ex. at 81.)

**Hoffend's Support of Pacitti**

As a result of the various disputes between Pacitti and the Association, Durr wrote to the Seapointe owners.  (Compl. Ex. 7.)  In a memorandum related to a December 3, 2004 meeting, Durr detailed the dispute between Pacitti and the Association.  The memorandum set forth the board of directors' concerns about Pacitti's renovations in his unit.  The memorandum also discussed the board of directors' belief that Pacitti had

> rented his unit since May of 2004 almost every week until sometime in October.
> All in violation of our rental regulations.  We have heard that Lenny, [Pacitti's]
> brother-in-law, died, so he and Rita would no longer use the unit over the winter
> season, as they had done for many years.  We are concerned that Pacitti now
> intends to expand the unit to 5 bedrooms and 4 full baths, so he can cram more
> renters into the unit and receive a larger rental fee.

(Id.)  Durr's memorandum recounted the various problems with Pacitti's guests, including two incidents where individuals were having sex in the pool and an incident where Pacitti's guest told Dieguez that he was paying a lot of money to rent Pacitti's unit.  (Id.)  Durr informed owners that the board of directors was pursuing legal action against Pacitti and planned to have the owners "affirm [its] decision to object to [Pacitti's action] by putting it on the ballot at the annual meeting."  (Id.)

Daniel Hoffend ("Hoffend") responded to Durr's memorandum regarding the December 3, 2004 meeting.  (Compl. Ex. C.)  In a letter dated January 13, 2005, Hoffend noted that Pacitti had previously done a lot for Seapointe.  (Id.)  Hoffend also indicated that the accusations about Pacitti relating to renovations and renters were largely untrue and were based on mere rumor and assumptions.  (Id.)  Hoffend encouraged the board of directors to avoid taking legal action against Pacitti and try to resolve amicably the issues with Pacitti.  (Id.)

On behalf of the board of directors, Durr responded to Hoffend's letter. (Compl. Ex. C.) Durr informed Hoffend that Pacitti then owed the Association in excess of $20,000. (Id.) Durr further informed Hoffend that the members of the board had been paying their fees in advance to help Seapointe with cash flow shortages. Further, Durr noted that, as a result of Pacitti's failure to pay timely his assessments and fees, the board was planning to divide the budget by only 14 owners instead of 15. The board was taking this action because it could not rely on Pacitti to meet his financial obligations to the Association. Durr noted that Pacitti had "never paid his assessments on a timely basis, but it is now ridiculous." (Id.) Durr informed Hoffend that Pacitti had violated Seapointe rules by having excessive visitors and renters and that Pacitti failed to obtain required approval related to his condominium renovations. (Id.)

**January 22, 2005 Meeting**

On January 22, 2005, the Association held a meeting of condominium owners. DiGennaro appeared for the meeting. Although DiGennaro had formerly owned a condominium at Seapointe (DiGennaro Dep. at 22, 33.), he was not an owner at the time of the January 22, 2005 meeting. (Luneack Dep. at 14.) DiGennaro attended the meeting as a result of Pacitti giving DiGennaro his proxy for the meeting. (Pacitti Dep. at 66.) Pacitti wanted DiGennaro to represent his interests during the meeting. (Id.) As the meeting began, Durr became angry that DiGennaro was in attendance and, therefore, terminated the meeting. (DiGennaro Dep. at 17.) Luneack thought it was a good idea to end the meeting because the meeting was getting out of control. (Luneack Dep. at 14, 16.)

While leaving the meeting, Durr had a disagreement with Hoffend. (DiGennaro Dep. at 17-18.) During this disagreement, DiGennaro recalls that he heard Durr say "[y]ou and your Mafia friends, you think you can do what you want here." (DiGennaro Dep. at 17-18) This occasion was not the first time DiGennaro made a derogatory comment about individuals of Italian descent. DiGennaro remembers Durr making derogatory comments about Italians anywhere from three to six occasions. (Id.at 18.) The first time, DiGennaro remembers Durr making derogatory comments was in the 1990s. (Id. at 19.) DiGennaro recalled a conversation in which Durr accused Pacitti of "being Mafia and us Italians, or us, the Italians, 'Think you can do what you want to do here, be better off if you weren't, you weren't here, [Pacittii] wouldn't live here." (Id.) DiGennaro recalled that he believed that Durr wanted DiGennaro and Pacitti to leave Seapointe (Id. at 21-22.) DiGennaro believed that Durr felt this way because Pacittii and he are both of Italian decent. (Id. at 22.) DiGennaro did not remember any other specific comments, but rather recalled that Durr made it unpleasant for him to live at Seapointe. (Id. at 34.)

Following this meeting, on January 26, 2005, Durr, Egan and Luneack wrote a memorandum to Seapointe condominium owners. (Compl. Ex. D.) The memorandum indicated that a number of owners were concerned that Pacitti may sue Durr, Durr's wife and the Association. The memorandum advised owners that Seapointe had an insurance policy to cover any litigation expenses. The memorandum further discussed Pacitti's unapproved renovations, problems with Pacitti's guests and Pacitti's late assessment payments. The board of directors requested support from the owners. (Id.)

**Cinquegrana's Altercation with Durr**

In addition to performing remodeling work for Pacitti, Cinquegrana performed remodeling work for Hoffend. (Cinquegrana Dep. at 20.) Hoffend owned a condominium unit at Seapointe. During the renovations, Cinquegrana learned that one of the steel support columns located within the walls of Hoffend's apartment was cracked. (Id. at 20-21.) Cinquegrana notified both Hoffend and the board of directors about the structural damage. (Id. at 21.)

Upon discovering the structural damage, Cinquegrana told the board of directors that he would not be able to continue with the renovations until an engineer inspected the support beam. (Id.) Cinquegrana informed the board that the engineer would have to sign a letter providing Seapointe with certification that the structural damage was inspected and that the building was safe. (Id. at 24.)

The board of directors wanted to have an engineer inspect the damage, but was unable to do so in a timely fashion. (Id. at 21.) In an effort to help move along the process, Cinquegrana suggested that the board of directors hire Al Capellini ("Capellini") to perform the inspection and any related work. (Id. at 21-22.) Capellini visited Seapointe and performed an inspection of the structural damage. While there, both Cinquegrana and Egan witnessed Capellini taking photographs and measurements. (Id. at 22, 31-32.)

After Capellini completed the engineering work, the board did not timely pay the engineering fee. (Id. at 22-23.) Cinquegrana encouraged the board to pay Capellini's bill so that he could obtain a letter stating that the structural damage was corrected. (Id. at 24.) Cinquegrana explained that he was unable to complete the work in Hoffend's condominium unless and until Capellini provided the clearance letter. (Id. at 30.) Cinquegrana informed the board that if

Capellini did not receive his engineering fees, he would place a "condemned" sign in front of Seapointe. (Id. at 35.)

When the board of directors took no action with respect to paying Capellini's bill, Cinquegrana spoke with Durr about the situation in an effort to resolve the matter. (Id.) Present for the conversation were Cinquegrana, Durr and Scott Smith ("Smith"), a Seapointe condominium owner. (Id. at 27.) During this conversation, Durr said that Capellini had not inspected the structural damage in Hoffend's condominium and had just taken the plans off of the internet. (Id. at 32.) Durr stated that he would not pay any thief. (Id. at 31.) Durr accused Capellini of trying to "hold up" Seapointe for money that he was not owed. (Id. at 30-31.) Cinquegrana tried to explain to Durr that Capellini had invested a fair amount of time and effort on the Seapointe inspection. (Id. at 31-32.) Cinquegrana told Durr that Capellini came to Seapointe on more than one occasion, took photographs and drafted plans for the repair of the support column. Cinquegrana expressed his opinion that Capellini's bill was fair and reasonable. (Id.)

Cinquegrana remembered that during the exchange with Durr, Durr called Cinquegrana a liar, a thief and accused Cinquegrana of trying to defraud the Association. (Id. at 25.) Cinquegrana indicated that Durr said Cinquegrana was a liar and thief like the rest of the Italians. (Id. at 33.) During the exchange, Durr indicated that his comments related to both Cinquegrana and Capellini. (Id. at 31-33.)

Smith remembered the altercation between Cinquegrana and Durr. Smith remembered that the conversation involved the cracked support column and the failure to pay the engineer. (Smith Dep. at 15.) Smith remembered that Egan was present for the discussion related to

Capellini's bill.  (Id.)  Smith did not recall Durr making any remark that anyone was a liar.  (Id.)  Smith did not recall anyone being called a thief or a crook.  (Id.)  Smith also did not recall any derogatory comments regarding Italians being made during the conversation regarding the engineer.  (Id.)  Smith recalled only one occasion when Durr made derogatory remarks about Italians.  (Id. at 16.)  This conversation occurred at Durr's apartment and referred to contractors with whom Durr worked in Pittsburgh, Pennsylvania.  (Id.)

Hoffend's recollection of the altercation between Durr and Cinquerana is different than Smith's recollection.  Hoffend remembered that Egan was not present for the altercation.  (Hoffend Dep. at 38.)  Hoffend recalled asking Durr to speak with Hoffend and Cinquegrana regarding the outstanding payment for Capellini (Id. at 39.)  Hoffend remembered Durr and Cinquegrana arguing about whether Capellini performed a final inspection at Seapointe.  (Id. at 40.)  When Durr refused to believe that Capellini had come to Seapointe to perform an inspection, Cinquegrana stated "[w]ell, then you're calling me a liar."  (Id. at 41.)  Durr responded "I guess I am because [Capellini] was never here."  (Id.)  Cinquegrana responded by walking away from Durr.  (Id.)  As Cinquegrana walked away, Hoffend heard Durr say "something about Italian Indian or scalping or something."  (Id.)  Hoffend was not sure exactly what Durr said and, in any event, did not understand the comments that he heard  (Id. at 41-42.)

The board of directors wrote a letter dated January 21, 2005 to Cinquegrana addressing the work performed on the steel columns.  (Compl. Ex. F.)  In its letter, the board stated its belief that Cinquegrana would be paid for work only after the board received certain documentation from Capellini.  The board further indicated that it would not pay Cinquegrana for his work until after he moved a trash container from the Seapointe parking lot.  (Id.)  In a letter dated February

10, 2005, Cinquegrana responded to the board of directors noting that it was not his responsibility to obtain the requested documentation from Capellini because Cinquegrana had not hired Capellini. Instead, Capellini was hired by the board. Cinquegrana indicated that the subject trash container was being used for the renovations on Pacitti's unit. Finally, Cinquegrana indicated that he would file a lien against the building if he did not timely receive payment for the work he had previously performed. (Id.)

The board of directors responded to Cinquegrana's letter, in a letter dated February 14, 2005. (Compl. Ex. F.) The board expressed its opinion that the board was ready and anxious to pay Cinquegrana's and Capellini's bills, but stated that it would not do so until it received the necessary documentation relating to work performed on the steel column.

On March 9, 2005, Pacitti and Cinquegrana filed the complaint in this case, which asserted state law claims against Durr for ethnic intimidation, defamation of character, invasion of privacy and civil rights violations pursuant to 42 Pa. Cons. Stat. § 8309.[3]

### Standard of Review

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A motion for summary judgment will not be defeated by

---

[3]     Plaintiffs also filed claims for harassment and conspiracy. This court previously granted defendant's motion to dismiss plaintiffs' claims for harassment and dismissed all claims against Jane Doe, including those for conspiracy.

the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. Id. at 249. The court is to draw all reasonable inferences in favor of the nonmoving party. El v. Southeastern Pa. Transp. Auth., 479 F.3d 232 (3d Cir.2007)("In considering the evidence, the court should draw all reasonable inferences against the moving party."). The United States Court of Appeals for the Third Circuit recently stated:

> [I]f there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact, pre-trial judgment cannot be granted. Specious objections will not, of course, defeat a motion for summary judgment, but real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will.

Id. at 238.

### *Analysis*

Defendant seeks summary judgment in its favor with respect to each of the three remaining claims asserted by Pacitti, i.e., ethnic intimidation (civil rights violation)[4], defamation of character and invasion of privacy and the defamation claim asserted by Cinquegrana. Each of

---

[4]As this court previously discussed, it will decide the ethnic intimidation and civil rights violation claims together. See supra note1.

24

plaintiffs' claims and the related parties' arguments will be discussed applying Pennsylvania law.[5]

## I.     Pacitti's Defamation Claim

Pacitti, in the complaint, asserts a claim for defamation of character against Durr. (Compl. ¶¶ 42, 43, 44.) Pacitti claims that Durr authored numerous letters and memoranda that contained fraudulent, malicious and vexatious material about Pacitti and that Durr made similar fraudulent, malicious and vexatious statements about Pacitti, which defamed and slandered Pacitti. (Compl. ¶ 42.)

A.  Elements of Claim

Under Pennsylvania law, a plaintiff can succeed in an action alleging defamation only where the plaintiff proves: (1) there was a defamatory communication; (2) the communication was published by the defendant; (3) the communication was applied to the plaintiff; (4) the recipient understood the communication's defamatory meaning; (5) the plaintiff understood the communication was intended to apply to the plaintiff; and (6) special harm to the plaintiff. 42 PA. CONS. STAT. § 8343(a); see Beverly Enterprises, Inc. v. Trump, 182 F.3d 183 (3d Cir. 1999). The issues before the court generally relate to the first element – whether Durr's statements about

---

[5]In this case, many of the subject actions took place either in either Pennsylvania or Florida. Since jurisdiction in this case is based upon diversity of citizenship, the court must apply the choice of law rules applicable in the Commonwealth of Pennsylvania. Klaxon Co. v. Stentor Electric Mfg. Co., Inc., 313 U.S. 487, 496-97 (1941); Hammersmith v. TIG Ins. Co., 480 F.3d 220 (3d Cir. 2007). The parties agree that there is no "true conflict" between the law of Pennsylvania and the law of Florida. Under these circumstances, the law of the forum state, Pennsylvania, applies. Pierce v. Capital Cities Communications, Inc., 576 F.2d 495 (3d Cir.1978). The court will analyze the relevant legal issues in accordance with Pennsylvania law.

Pacitti were defamatory- and the second element - whether Durr published certain statements.  A statement is defamatory "if it tends to harm an individual's reputation so as to lower him in the estimation of the community or deter third persons from associating or dealing with him."  U.S. Healthcare v. Blue Cross of Greater Phila., 898 F.2d 914, 923 (3d Cir.1990) (citing Birl v. Philadelphia Elec. Co., 167 A.2d 472, 476 (Pa. 1960)); Kryeski v. Schott Glass Technologies, 626 A.2d 595, 600 (Pa.Super.Ct. 1993) (quoting Zartman v. Lehigh County Humane Soc., 482 A.2d 266, 268 (Pa.Super.Ct. 1984)).  Courts have held that a publication is defamatory "if it tends to blacken a person's reputation or expose him to public hatred, contempt, or ridicule, or injure him in his business or profession."  Green v. Minzer, 692 A.2d 169, 172 (Pa.Super.1997)(citing Livingston v. Murray, 612 A.2d 443, 447 (Pa.Super.Ct. 1992)).  It is noteworthy, however, that "[s]tatements which are merely annoying or embarrassing or no more than rhetorical hyperbole or a vigorous epithet are not defamatory."  Kryeski v. Schott Glass Techn., Inc., 626 A.2d 595, 601 (Pa.Super.Ct. 1993).  The mere fact that a statement is offensive and distasteful does not amount to defamation because the law does not extend to insult, without more.  Beverly Enterprises, Inc. v. Trump, 182 F.3d at 187.  It is the function of the court to determine whether the subject statement is capable of a defamatory meaning.  U.S. Healthcare v. Blue Cross of Greater Phila., 898 F.2d at 923.

"Publication of defamatory matter is the intentional or negligent communication of such matter to one other than the person defamed."  Chicarella v. Passant, 494 A.2d 1109, 1112 (Pa.Super.Ct. 1985) (citing Gaetano v. Sharon Herald Co., 231 A.2d 753, 755 (Pa. 1967); Agriss v. Roadway Express, Inc., 483 A.2d 456, 463 (Pa.Super.Ct. 1984); RESTATEMENT (SECOND) OF TORTS § 577).

B. Defenses

"The defendant can defend against an action in defamation by proving that the defamatory communication was true, the occasion on which it was published was of privileged character, or that the character of the subject matter of defamatory comment was a public concern." Spain v. Vicente, 461 A.2d 833 (Pa.Super.Ct. 1983) (citing 42 PA. CONS. STAT § 8343(b). Two of those defenses are raised by Durr: truth and privilege.

1. Truth as a defense

With respect to truth as a defense, a defendant can meet his burden of proving the truth of the communication as long as he proves the statement to be substantially true. Chicarella v. Passant, 494 A.2d 1109, 1115 n.5 (Pa.Super.Ct. 1985) (cited in Tucker v. Merck & Co., Inc., 102 Fed.Appx. 247, 253 (3d Cir. Jun 29, 2004)). "Pennsylvania has determined proof of substantial truth must go to the 'gist' or 'sting' of the alleged defamatory matter." Keeshan v. The Home Depot, U.S.A., Inc., 2001 WL 310601, at *15 (E.D.Pa. Mar.27, 2001), aff'd, 35 Fed.Appx. 51 (3d Cir. May 28, 2002) (cited in Marier v. Lance, Inc., 2007 WL 3120263 (W.D.Pa Oct.23, 3007)).

2. Privilege

In addition to showing that a subject statement is true, a defendant may defend a defamation action by showing that he made a statement pursuant to a conditional privilege. "'An occasion is conditionally privileged when the circumstances are such as to lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that facts exist which another sharing such common interest is entitled to know.'" Rankin v. Phillippe, 211 A.2d 56, 58 (Pa.Super.Ct.1965) (quoting, RESTATEMENT OF TORTS § 596 (1939)) (cited in Miketic v. Baron, 675 A.2d 324 (Pa.Super.Ct.1996)). In other words, "if

the publisher reasonably believes that the recipient shares a common interest in the subject matter and is entitled to know," <u>Daywalt v. Montgomery Hosp.</u>, 573 A.2d 1116, 1118 (Pa.Super.Ct. 1990) (citing RESTATEMENT (SECOND) OF TORTS § 596) (cited in <u>Howard v. Deklinski</u>, 2002 WL 31501850 (3d Cir. Nov. 12, 2002)), the publisher may have a conditional privilege.  A defendant abuses the privilege and, therefore, waives the privilege when a publication of misinformation (1) is actuated by malice or negligence; (2) is made for a purpose other than that for which the privilege is given; (3) is made to a person not reasonably believed to be necessary for the accomplishment of the purpose of the privilege; or (4) includes defamatory matter not reasonably believed to be necessary for the accomplishment of the purpose.  <u>Elia v. Erie Ins. Exch.</u>, 634 A.2d 657, 661 (Pa.Super.Ct.1993) (cited in <u>Tucker v. Merck & Co., Inc.</u>, 102 Fed.Appx. at 254).


     C.  <u>Allegedly defamatory statements and application of defenses</u>

     In the instant matter, plaintiff complains that seven letters and memorandums, authored by Durr are defamatory in nature.  The court will address each of these written communications in turn.

    *1.  Durr's Memorandum Calling a Special Meeting on December 3, 2004*

     Pacitti complains that Durr's December 3, 2004 memorandum is defamatory because the memorandum indicates that Pacitti was renting his condominium every week from May to October 2004 and that on two occasions Pacitti's visitors engaged in sexual acts in the pool. (Compl. ¶ 43)  Pacitti further complains that the memorandum accused him of planning to cram more renters into his condominium to receive a larger rental fee.  (<u>Id.</u>)  Pacitti alleges that these statements were false and defamatory and that they have caused damage to his reputation.  This

court disagrees with Pacitt's assertions because the statements contained within the memorandum fall within at least one of the following: a) were not capable of defamatory meaning, b) were substantially true, or c) the dissemination of the memorandum was privileged.

*(a) Statements relating to renters are not capable of defamatory meaning*

First, the statements contained within the December 3, 2004 memorandum were not capable of defamatory meaning. As noted above, the law is clear that in order for a statement to be actionable, it must be capable of harming an individual's reputation so as to lower him in the estimation of the community or deter third persons from associating or dealing with him. No reasonable finder of fact could conclude that the statements about which Pacitti complain are capable of defamatory meaning. The assertion that Pacitti was renting his condominium and that the board of directors believed he planned to enlarge his condominium in an effort to "cram more renters into [his] unit" is not harmful to Pacitti's reputation to the community; nor would this assertion deter others in the community from associating or dealing with Pacitti. These statements relate to an allegation that Pacitti failed to follow the Seapointe rental regulations. As such, no reasonable jury could conclude that the statements rise to the level of defamation or that they impugned Pacitti's reputation.

*(b) The statements relating to Pacitti's guests' behavior are substantially true*

To the extent Pacitti complains about statements relating to allegations that his guests engaged in sexual conduct at the Seapointe pool, these statements are substantially true and, therefore, are not actionable. The evidence of record is that Diguez witnessed two individuals engaging in sexual intercourse at the Seapointe pool. Diguez recognized the two individuals as being Pacitti's guests. Pacitti does not dispute that the individuals identified by Diguez were

having sexual intercourse at the pool. Instead, Pacitti indicated that had he known who the individuals were, he would have confronted them about their behavior.

On a separate occasion, Dr. Lavernia saw a woman exposing herself while at the Seapointe pool. Dr. Lavernia witnessed a woman lift up her bikini top and expose her breasts to a male companion. Dr. Lavernia told Dr. Galainena what he saw, but they did not report the incident at that time. Dr. Lavernia and Dr. Galainena later discussed the incident at a party attended by Seapointe owners and Diguez. When Dr. Lavernia described the individuals to Diguez, Diguez and Egan recognized the couple as being Pacitti's guests. Although Dr. Lavernia testified that the individuals were not engaged in sexual intercourse, a woman exposing her breasts to a man in a pool has sexual overtones. Diguez reported this incident to the board of directors stating that Dr. Lavernia was unhappy that people were having sex underneath Dr. Lavernia's balcony. Accordingly, to the extent Durr's December 3, 2004 memorandum referenced allegations relating to Pacitti's guests engaging in sexual conduct, a reasonable finder of fact could only conclude that the gist of these statements is substantially true and, thus, they are not actionable.

*(c) The statements contained within the memorandum are conditionally privileged*

Pacitti asserts that Durr should not be afforded the benefit of conditional privilege because he was negligent in making the statements contained within the subject communications. No reasonable finder of fact, however, could agree with Pacitti.

The record is clear that during the time period at issue, Durr was president of the Seapointe board of directors. In his position as president, Durr investigated matters brought to his attention by both owners and Seapointe employees. Diguez advised Durr that Pacitti's guests

were having sex while at the pool. Diguez advised the board of directors that one of Seapointe's owners - Dr. Galainena- was unhappy with the situation because his grandchildren often visited him at Seapointe and such behavior was inappropriate for their young eyes. Diguez also notified the board that he had witnessed two of Pacitti's guests having sexual intercourse at the pool.

With respect to Pacitti renting his condominium, here again, Durr was advised by Diguez that one of Pacitti's guests complained about certain equipment malfunctioning in Pacitti's unit because the guest had paid good money to rent the unit. Durr was also aware, and Pacitti does not dispute, that Pacitti had numerous guests stay at his unit.

Each of these actions, guest conduct and number of guest visitors, was in clear violation of the bylaws. The Seapointe condominium owners shared a common interest in making sure that the rules and regulations of Seapointe were followed by all owners because failure to do so potentially affects all of them. Each of the condominium owners, including Pacitti and Durr, had a vested interest in making sure that Seapointe maintained the quality and atmosphere originally bargained for by the owners. Durr, as board president, had the authority to address these issues with Pacitti and other Seapointe condominium owners because each of the owners share a common interest in Seapointe and had a right to know when one of the owner's behavior and actions threatened Seapointe's environment.

It is Pacitti's burden to adduce sufficient evidence for a reasonable jury to conclude that Durr's actions were "motivated solely by spite or ill-will against [Pacitti] and not by a desire to benefit a common legitimate objective through full disclosure." Howard v. Deklinski, 2002 WL 31501850 (3d Cir. Nov. 12, 2002) (emphasis added). On record before the court, no reasonable finder of fact could conclude that Durr was motivated solely by spite or ill-will against Pacitti.

The record supports that there was a basis for Durr to believe that the communications were necessary in an effort to assure that the condominium bylaws were followed. The evidence of record reflects that Durr took steps to assure that other condominium owners followed Seapointe's rules and regulations. Durr attempted to collect late assessments from Pacitti as well as other owners. The evidence of record is insufficient to support Pacitti's arguments thatt Durr's statements to Seapointe owners were not conditionally privileged and, thus, no reasonable finder of fact could render a verdict in favor of Pacitti on this claim.

2. *December 1, 2004 Memorandum*

In his complaint, Pacitti asserts that the December 1, 2004 memorandum is defamatory. Pacitti, who is very briefly mentioned in the memorandum, does not indicate what part of the memorandum is defamatory. Further, the identity of the author is unclear as the memorandum was signed by the "Seapointe Board of Directors."

In order to succeed in a suit for defamation, Pacitti must prove, among other things, that the allegedly defamatory statement was made by Durr. The December 1, 2004 memorandum is unsigned. There is no indication in the record which board member authored and published the memorandum. Accordingly, Pacitti did not adduce sufficient evidence for a reasonable finder of fact to conclude that Durr published the memorandum. Under those circumstances, Pacitti's defamation claim as it relates to the December 1, 2004 memorandum will not withstand Durr's

motion for summary judgment because Pacitti did not adduce evidence that Durr authored the allegedly defamatory statements contained within the memorandum.[6]

### 3. June 21, 2004 Letter

Pacitti complains that Durr's June 21, 2004 letter is defamatory. Durr's June 21, 2004 letter is addressed to Pacitti and copied to Rogel, the counsel for the Association and two board members, Egan and Luneack. The June 21, 2004 letter i) advised Pacitti that shutters will be installed on all windows and collection will proceed in connection with the installation; ii) requested that Pacitti pay his delinquent second quarter assessments; iii) advised Pacitti that his delinquency in paying assessments forces other owners to advance assessments to assist Seapointe with cash flow shortages; and 4) requested Pacitti to cease renting his unit and advise either the board or Dieguez of any guests.

### (a) The statements contained within the letter are not capable of defamatory meaning

Pacitti complains that the statements within the June 21, 2004 letter are defamatory. Upon close analysis, this court concludes that no reasonable finder of fact could conclude that there is any defamatory meaning in the statements contained within the June 21, 2004 letter. Although Pacitti may be embarrassed or annoyed by Durr sending him a letter relating to the alleged violations, mere embarrassment or annoyance is not sufficient to establish a claim for defamation. Kryeski v. Schott Glass Techn., Inc., 626 A.2d at 601. The statements in the June 21, 2004 letter simply are incapable of harming Pacitti's reputation such that other people would

---

[6]The court need not reach the question whether the statements contained within the December 1, 2004 memorandum are defamatory because Pacitti failed to address evidence that Durr authored the memorandum.

be deterred from associating or dealing with him. Accordingly, this court finds that no reasonable fact finder could conclude that the statements contained withing the June 21, 2004 letter are defamatory.

*(b) The statements contained within the letter are substantially true*

Pacitti does not dispute the factual basis of many of the statements contained within the June 21, 2004 letter. Indeed, when asked whether his assessments were late at various times, Pacitti did not know. When confronted with evidence from Seapointe's bookkeeper relating to his delinquent assessments, Pacitti explained that his secretary paid his bills and he did not know why the assessments were late. Pacitti does not dispute the fact that board members and other owners paid their assessments in advance in an effort to help Seapointe with cash flow. The undisputed facts of record reflect that Durr's assertion that Pacitti's assessments were late cannot be defamatory because Durr's statements were true.

With respect to the number of guests visiting Pacitti's unit, Pacitti acknowledged that he had numerous guests stay at his condominium. Pacitti could not estimate the number of guests or the length of time that the guests visited his condominium, but he knew there were many instances. It is clear from the evidence of record that Seapointe only permits three rentals per year and that the rentals must be for a minimum of thirty days. Further, the record is clear that the board asked each owner to advise either the board or Dieguez when family, friends, guests or renters were on the premises. Pacitti admitted that he never provided either the board or Dieguez with the requested information because it was his property and he would use it how he saw fit. A reasonable finder of fact could conclude only that the gist of Durr's statements relating to Pacitti's guests, therefore, was substantially true.

The court notes that Pacitti vehemently denied renting his condominium to anyone. On one occasion, however, one of Pacitti's guests told Diguez that he was renting Pacitti's condominium. This guest demanded that certain equipment in Pacitti's condominium be repaired because he had paid good money to stay there. Diguez reported this matter to the board of directors. Based upon the number of guests coming and going from Pacitti's unit and that one of those guests asserted that he was renting the unit, a reasonable finder of fact could not find in favor of Pacitti. By reason of the evidence of record supporting that the gist of Durr's statements relating to Pacitti's rentals was substantially true, a reasonable finder of fact could not find that the statements in this letter were defamatory.

*(c) The statements contained within the letter are conditionally privileged*

As discussed above, Durr's statements in the letter relating to Pacitti's payment of assessments and failure to abide by the rental rules and regulations were made within the scope of Durr's position as president of the board of directors and his function as the chief executive officer for the Association. One of Durr's responsibilities was to assure that owners timely pay assessments and other expenses. Likewise, Durr was responsible for assuring that Seapointe owners abided by the bylaws and related rules and regulations. The bylaws expressly provide that the board of directors is responsible for enforcing "governing the use and operation of [Seapointe] and the use of the common elements." (Pacitti Dep. Ex. 1 at RD00157.) Durr and the other condominium owners had a common interest in making sure that the rules and regulations of the condominium association are followed. Durr's communications in the letter were limited to those made in his capacity as president of the board of directors and for the purpose of disseminating information regarding the Seapointe community and compliance with

the bylaws. Because the evidence of record reflects that there was a common interest in maintaining the peace and tranquility of Seapointe a reasonable finder of fact could not conclude that Durr's statements within the June 21, 2004 letter were actionable.

Defendant's motion for summary judgment with respect to Pacitti's defamation claim relating to this communication must be granted.

### 4. January 13, 2005 Letter

Pacitti complains about a January 13, 2005 letter addressed to Hoffend. In this letter sent on behalf of the board of directors, Durr responded to a letter written by Hoffend regarding Pacitti. In Durr's letter, Durr addressed Pacitti's failure to pay timely his assessments and to comply with Seapointe's rules and regulations relating to guest visits.

#### (a) The statements contained within the letter are substantially true

As discussed above with respect to similar statements made in other communications, Pacitti does not dispute the factual basis of many of the statements contained within the January 13, 2005 letter. Pacitti acknowledged that his assessments were late and does not dispute that other owners paid their assessments in advance to assist Seapointe with cash flow shortages. Under these circumstances no reasonable finder of fact could conclude that Durr's statements to Hoffend regarding Pacitti's delinquent assessments were not defamatory because the statements were true.

Likewise, Durr's statements relating to Pacitti's guests are also substantially true. As noted above, Pacitti admitted to permitting numerous guests to visit his unit without notifying either the board or Dieguez of the guests' identities. Each statement relating to Pacitti's practice

of allowing numerous guests to visit his unit is substantially true. The gist of these statements was that Pacitti was allowing repeated visitors to stay in his unit and that this practice was against Seapointe rules and regulations. No reasonable finder of fact could conclude that these statements are defamatory because these statements are substantially true.

*(b) The statements contained within the letter are conditionally privileged*

As previously discussed with respect to other communications, Durr's statements relating to Pacitti's payment of assessments and failure to abide by the rental rules and regulations were made within the scope of Durr's authority as president of the board of directors. Specifically, Durr's January 13, 2005 letter was sent on behalf of the board of directors and in response to a letter written to the board of directors about Pacitti. For the reasons stated above, no reasonable finder of fact could render a verdict in favor of Pacitti with respect to this claim.

Defendant's motion for summary judgment with respect to Pacitti's defamation claim relating to this communication must be granted.

*5. January 25, 2005 Memorandum*

Pacitti complains that the January 25, 2005 memorandum is defamatory in nature. This court notes at the outset that the memorandum was authored and signed not only by Durr, but also by Egan and Luneack. The memorandum addressed the possibility of upcoming renovations to the elevator. The memorandum indicated that the Seapointe elevator was worn prior to renovations on Pacitti's unit and noted that scratching and bumping the elevator during those renovations exacerbated the problem. The memorandum stated that the board intended to pursue reimbursement for repairs from both Cinquegrana and Pacitti. The memorandum also noted that

Pacitti was delinquent in paying his 2004 assessments and informed the owners that as a result of Pacitti's delinquency, three board members and one owner paid their assessments in advance to help Seapointe. Upon review of the memorandum, the court concludes that like the aforementioned communications, no reasonable finder of fact could conclude that the January 25, 2005 memorandum was defamatory because the statements are substantially true and conditionally privileged. As such, this communication is not actionable.

Defendant's motion for summary judgment with respect to Pacitti's defamation claim relating to this communication must be granted.

*6. January 26, 2005 memorandum*

In his complaint, Pacitti asserts that the January 26, 2005 memorandum is defamatory in nature. The January 26, 2005 memorandum indicated that a number of owners were concerned that Pacitti may sue Durr, Durr's wife and the Association. The memorandum advised condominium owners that Seapointe had an insurance policy to cover any litigation expenses. The memorandum further discussed Pacitti's unapproved renovations, problems with Pacitti's guests and Pacitti's late assessment payments.

Other than the statements addressed above which were made in other communications and which no reasonable finder of fact could conclude were defamatory, the court is unable to determine any other the statements which plaintiff complains are actionable. Upon close analysis of Pacitti's deposition transcripts, this court was unable to find that Pacitti denied the validity of any information contained within the letter.

This court recognizes that the subject letter is overly dramatic and was annoying to Pacitti. As discussed above in connection with other communications, the statements made in

this letter could not be found to be defamatory by a reasonable finder of fact.   The letter addresses the threat, and ultimate realization, that Pacitti would initiate litigation as a result of his disputes with Durr or the Association.  The letter informed condominium owners that they did not need worry about the threats because the Association had insurance to cover the costs associated with litigation.  The memorandum further detailed recurring issues related to Pacitti's late payments, guest behavior and other condominium rule infractions.  Each of these matters addressed in the memorandum presented a matter of common interest for the condominium owners.  The court notes that the memorandum is signed by Durr and all other members of Seapointe's board of directors.  No reasonable finder of fact could conclude that the January 26, 2005 memorandum was defamatory because there is no evidence of record that the information contained in the memorandum is false.  The evidence of record also supports that the statements are conditionally privileged.

Defendant's motion for summary judgment with respect to Pacitti's defamation claim relating to this communication must be granted.

### *7. February 4, 2005 Letter*

In a letter dated February 4, 2005, Durr, Egan and Luneack, on behalf of the Seapointe board of directors, wrote a letter to Pacitti and Cinquegrana.  The February 4, 2005 letter relates to complaints the board had received relating to renovations of Pacitti's unit.  The letter generally addressed the cleanliness of bathrooms, surrounding areas and dumpsters used by Cinquegrana's employees.  The letter also addressed the condition of Seapointe's elevator and stated that the cost of refurbishing the elevator would have to be negotiated among Pacitti, Cinquegrana and the Association.  The statements contained within the letter were substantially true.  The record is

clear that both Dieguez and the board of directors received complaints about the cleanliness of Cinquegrana's work area as well as the state of the elevator. Finally, the letter discussed concerns about the renovations and requested Pacitti to explain his plans to address the situation. In his complaint, Pacitti complains that this letter is defamatory. No reasonable finder of fact could find that the statements were not substantially true and conditionally privileged as those statements were made by the board of directors regarding a situation of common interest to the Seapointe condominium owners.

Defendant's motion for summary judgment with respect to Pacitti's defamation claim relating to this communication must be granted.

## II.    Cinquegrana's Defamation Claim

Cinquegrana, in his complaint, asserts a claim for defamation of character against Durr. (Compl. ¶¶ 56-59.) Cinquegrana claims that Durr authored numerous letters and memorandums, and made numerous statements which were defamatory. (Compl. ¶ 59.) Specifically, Cinquegrana references the letters and memoranda previously addressed by this court with respect to Pacitti's defamation claims. As this court has concluded that no reasonable finder of fact could conclude that the previously discussed statements are defamatory, Cinquegrana's defamation claim cannot succeed based on those communications.

The court, however, has not addressed two letters about which Cinquegrana complained. Specifically, Cinquegrana asserts that a January 21, 2005 letter and a February 14, 2005 letter are defamatory. These letters addressed an ongoing dispute between the board and Cinquegrana. The dispute resulted from work performed on steel columns at Seapointe. Cinquegrana

performed the work and requested payment for the work. The board agreed to pay Cinquegrana a specified amount for the work if Cinquegrana provided the board with certain documentation relating to the repair work. The board further requested that Cinquegrana and his company prepare to pay costs assessed by the board for certain damages done to the Seapointe elevator. Finally, the board demanded that Cinquegrana remove his dumpster from the Seapointe parking lot. The board indicated that it wished to resolve the issues quickly and amicably but would need the appropriate documentation prior to submitting final payment to either Cinquegrana or Capellini.

Upon close analysis, this court concludes that no reasonable finder of fact could conclude that either of these letters is defamatory. Both the January 21, 2005 and the February 14, 2005 letters about which Cinquegrana complain were drafted by the Seapointe board of directors and were sent only to Cinquegrana. As discussed more fully above, in order to succeed on a defamation claim, a plaintiff must show that a defamatory statement was published to a third party. In this instance, Cinquegrana failed to present any evidence that either letter was sent to anyone other than himself. Cinquegrana did not present any evidence that Durr authored and published the letters. Each of the letters was signed by the Seapointe board of directors.

In addition, if the subject letters contain only opinions then they cannot be defamatory. The law is settled that "expressions of pure opinion that rely on disclosed facts are not actionable." Feldman v. Lafayette Green Condo. Ass' n, 806 A.2d 497, 501 (Pa.Commw.Ct.2002). A statement is a non-actionable expression of opinion where the opinion is accompanied by disclosure of the facts supporting the defendant's opinion. Id. at 501-02. This court must determine whether the statements contained within the written communications are

opinions.  See Green v. Mizner, 692 A.2d 169, 174 (Pa.Super.Ct.1997) (whether a particular statement is opinion is a question of law for the court).

In this case, the board of directors detailed the reasons it held the opinions as expressed in its communications to Cinquegrana.  In the January 21, 2005 letter, the board explained that it would pay Cinquegrana if he provided pictures of the steel columns he prepared.  The board requested pictures of the steel columns before the repair and after the repair.  The board explained that future boards would need to know the history of the work performed on the columns.  The letter also request that Cinquegrana obtain certain documentation from Capellini regarding repair work on the steel columns.  Next, the letter addressed the cost of repairing damage done to the Seapointe elevator.  The letter indicated that the numerous witnesses observed Cinquegrana and his employees damaging the Seapointe elevators.  Finally, the board requested that Cinquegrana remove the trash container from Seapointe's parking lot prior to receiving payment from the board.  The evidence of record reflect that the statements in this letter are merely opinions of the board of directors based on disclosed facts.  Under those circumstances, no reasonable finder of fact could conclude that the statements were defamatory.

Similarly, the February 14, 2005 letter further explained the facts upon which the board relied to hold its opinions.  The letter, in large part, discussed the relationship between the board and Capellini.  The letter proceeded by informing Cinquegrana that if he closed the wall around the steel columns without the board having the benefit of pictures of those columns, Cinquegrana would be required to open the walls so that photographs could be taken.  The board explained that Seapointe would not bear the cost of opening the walls because they should not have been closed prior to receiving the proper documentation.  Here again, the statements made by the

board of directors are based upon disclosed facts and constitute non-actionable opinions.

Cinquegrana failed to adduce sufficient evidence from which any reasonable finder of fact could

conclude that either the January 21, 2005 or the February 14, 2005 letter was defamatory.

Accordingly, Cinquegrana's defamation claim against Durr fails as a matter of law and summary

judgment must be granted in favor of Durr with respect to this claim.

## III.   Pacitti's Invasion of Privacy Claim

In his complaint, Pacitti asserts a claim for invasion of privacy against Durr.  (Compl. ¶¶

45-47.)  Pacitti claims that Durr caused an unknown individual to investigate Pacitti and Pacitti's

business.  (Compl. ¶ 46.)  Pacitti further claims that the investigation concerned confidential and

privileged financial affairs relating to both Pacitti and Pacitti's business.  (Id.)  Pacitti asserts that

Durr caused the confidential and privileged information to be disseminated to all Seapointe

condominium owners and other individuals.  (Id.)  Finally, Pacitti claims that Durr invaded his

privacy by illegally entering Pacitti's property without his knowledge or consent.  (Compl. ¶ 47.)

Under Pennsylvania law, to state a cause of action for invasion of privacy, a plaintiff must

prove that "there was an intentional intrusion on the seclusion of their private concerns which

was substantial and highly offensive to a reasonable person, and aver sufficient facts to establish

that the information disclosed would have caused mental suffering, shame or humiliation to a

person of ordinary sensibilities."  Pro Golf Manufacturing, Inc. v. Tribune Review Newspaper

Co., 809 A.2d 243 (Pa.2002) (citing McGuire v. Shubert, 722 A.2d 1087 (Pa.Super.Ct.1998) and

Aquino v. Bulletin Co., 528, 154 A.2d 422 (Pa.Super.Ct. 1959)).  An action for an invasion of

privacy is comprised of four distinct torts: (1) intrusion upon seclusion; (2) appropriation of

name or likeness; (3) publicity given to a private life; and (4) publicity placing the person in a false light. <u>Burger v. Blair Medical Associates, Inc.</u>, 928 A.2d 246 (Pa.Super.Ct. 2007) (citing <u>Harris by Harris v. Easton Pub. Co.</u>, 483 A.2d 1377, 1383 (Pa.Super.Ct.1984)).

In his brief in opposition to the motion for summary judgment, Pacitti indicates that his invasion of privacy claims are based upon allegations of intrusion upon seclusion, publicity given to a private life and publicity placing the person in a false light. The court will address each of these issues.

### A.      Intrusion Upon Seclusion

The Pennsylvania courts have defined this claim, in accordance with the Restatement (Second) of Torts (1977), as follows: "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." <u>See</u> RESTATEMENT (SECOND) OF TORTS § 652B; <u>see also</u> <u>Kline v. Security Guards, Inc.</u>, 386 F.3d 246 (3d Cir.2004) (citing <u>Harris by Harris</u>, 483 A.2d 1377, 1383). To maintain this claim, a plaintiff must show that the intrusion was (1) intentional; (2) upon the solitude or seclusion of the plaintiff, or his private affairs or concerns; and (3) substantial; and (4) highly offensive. <u>Larsen v. Philadelphia Newspapers, Inc.</u>, 543 A.2d 1181, 1186-87 (Pa.Super.Ct.1988) (cited in <u>Tucker v. Merck & Co., Inc.</u>, 102 Fed.Appx. at 256) . To be actionable a plaintiff must show "that the information disclosed would have caused mental suffering, shame, or humiliation to a person of ordinary sensibilities." <u>McGuire v. Shubert</u>, 722 A.2d at 1091.

This claim also requires that the plaintiff have a reasonable expectation of privacy. <u>Harris by Harris</u>, 483 A.2d at 1383. ("The defendant is subject to liability under this section only when

he has intruded into a private place, or has otherwise invaded a private seclusion that the plaintiff has thrown about his person or affairs.") (citing RESTATEMENT (SECOND) OF TORTS § 652B cmt. c)).  The tort may occur "(1) by physical intrusion into a place where the plaintiff has secluded himself, (2) by use of the defendant's senses to oversee or overhear the plaintiff's private affairs, or (3) some other form of investigation or examination into plaintiff's private concerns."  Id. at 1383.  The intrusion itself makes the defendant subject to liability, even though there is no publication or other use of any kind of the photograph or information outlined.  Borse v. Piece Goods Shop, Inc., 963 F.2d 611 (3d Cir. 1992).  Liability attaches only when the intrusion is substantial and would be highly offensive to "the ordinary reasonable person."  Harris by Harris, 483 A.2d at 1383-84.

To recover for a claim for invasion of privacy, a plaintiff must adduce evidence that there was an intentional intrusion on the seclusion of his or her private concerns.  McGuire v. Shubert, 722 A.2d at 1092.  The plaintiff must also establish that the intrusion was substantial and would be highly offensive to a reasonable person.  Id.  Finally, the plaintiff must show that the information disclosed would have caused mental suffering, shame, or humiliation to a person of ordinary sensibilities.  Id.

Pacitti complains that Durr's entering Pacitti's condominium to speak with Cinquegrana was an invasion of Pacitti's privacy because Pacitti had no knowledge that Durr was going to enter into his unit and did not give Durr permission to enter his unit.  Pacitti further complains that Durr invaded his privacy by investigating Pacitti's financial matters relating to encumbrances against Pacitti's unit at Seapointe.

The court's inquiry must focus on whether a rational jury could find Durr's actions- coming into Pacitti's unit to speak with Cinquegrana and investigating encumbrances against Pacitti's unit- to have been highly offensive. With respect to Durr entering Pacitti's unit, the evidence of record is that Durr entered Pacitti's unit at the time the unit was under construction. Cinquegrana was responsible for the renovations. In an effort to ascertain information about the renovations, Durr approached Cinquegrana who was working in Pacitti's unit. There is no indication that Pacitti was in the unit at that time. Cinquegrana did not ask Durr to leave the unit during their conversation. Cinquegrana testified that Durr and he had a short conversation about the renovations and Durr left the unit without incident. Under these circumstances, this court concludes that no reasonable finder of fact could conclude that Durr's actions were highly offensive.

Similarly, no reasonable finder of fact could conclude that Durr's alleged investigation into public records reflecting encumbrances on Pacitti's Seapointe unit would be highly offensive. Pacitti had a long history relating to his failure to pay timely assessments and to abide by Seapointe rules and regulations. As a result of Pacitti's failure to pay his assessments, the board of directors, on more than one occasion, filed liens against Pacitti's unit. There is no dispute that liens are a matter of public record. Pacitti failed to establish evidence that Durr's alleged investigation was in any way improper or malicious. There is no evidence of record that any information contained in the public records caused Pacitti to suffer from mental anguish, humiliation, embarrassment or shame. Thus, no reasonable finder of fact could conclude that Durr's alleged investigations into publicly recorded encumbrances against Pacitti's unit were highly offensive, a threshold requirement of a claim for intrusion upon seclusion.

**B.	Publicity Given to a Private Life**

In order to succeed on a claim for invasion of privacy based upon publicity given to private life, the plaintiff must show that defendant published a matter of a kind that (a) would be highly offensive to a reasonable person and (b) is not of legitimate concern to the public.  Harris by Harris, 483 A.2d at 1384 (citing RESTATEMENT (SECOND) OF TORTS § 652D)).  The elements to be proven are (1) publicity, (2) given to private facts, (3) which would be highly offensive to a reasonable person and (4) which are not of legitimate concern to the public.  (Id.)

"'Publicity' means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge."  Vogel v. W.T. Grant Co., 327 A.2d 133, 137 (Pa. 1974). Disclosure to only one person is insufficient. Harris by Harris, 483 A.2d at 1384.  Similarly, a claim for publicity given to private life fails where publication is made to a small group.  Vogel, 327 A.2d at 137 (citing RESTATEMENT (SECOND) OF TORTS § 652D, cmt. b).  There is an invasion of privacy only where a communication is "substantially certain to become one of public knowledge."  Id. at 136.

A "private fact" is one that has not already been made public, as liability cannot be based upon that which the plaintiff himself leaves open to the public eye or when the publicity given involves facts with which the recipient is already familiar.  Harris by Harris, 483 A.2d at 1385. Unreasonable publicity given to the existence of a debt has often been held to constitute an invasion of privacy.  Vogel, at 135.  Official court records which are capable of public inspection are incapable of being the basis for a claim based on publicity given to a private life.  Harris by Harris, 483 A.2d at 1385.

In the instant matter, Pacitti claims that Durr published private facts about him and that the publication of those facts would be highly offensive to a reasonable person. Pacitti claims that Durr's wrongdoing relates to his alleged investigation into Pacitti personal and business financial records. The record is devoid of any evidence that Durr conducted an investigation other than Durr's having information from public records. The record is similarly devoid of any evidence that Durr published Pacitti's personal and financial records to the public at large. In his declaration, Durr acknowledges that as president of the board of directors he had access to Pacitti's mortgage documents. There is no indication, however, that Durr obtained these records improperly or that he published any information which was not matter of public record. There is no dispute that the records to which Durr had access are public records. Under these circumstances no reasonable finder of fact could conclude that there was a publication of any private fact or that a reasonable person would be highly offended by Durr's actions.

### C. False Light

Pacitti also claims that Durr committed the tort of false light-invasion of privacy. Under Pennsylvania law, an individual can be liable for false light-invasion of privacy where the individual causes "publicity that unreasonably places the other in a false light before the public." Strickland v. Univ. of Scranton, 700 A.2d 979, 987 (Pa.Super.Ct.1997) (cited in Rush v. Philadelphia Newspapers, Inc., 732 A.2d 648, 654 (Pa.Super.Ct.1999)). "A cause of action for invasion of privacy will be found where a major misrepresentation of a person's character, history, activities or beliefs is made that could reasonably be expected to cause a reasonable man to take serious offense." Id.

The record does not contain any evidence to support a claim for false light-invasion of privacy. There is no evidence of record that Durr made any "major misrepresentations" about any facts related to Pacitti. Pacitti failed to present sufficient evidence from which a reasonable jury could find that Durr invaded Pacitti's privacy and the summary judgment must be entered in favor of Durr on this claim.[7]

## VI. Pennsylvania Ethnic Intimidation and Civil Rights Violation Claims

In his complaint, Pacitti sets forth a claim for ethnic intimidation pursuant to 18 PA. CONS.STAT.ANN. § 2710. (Compl. ¶¶ 31-37) Pacitti alleges that Durr engaged in a course of conduct directed at violating Pacitti's rights. (Compl. ¶ 32) Pacitti further asserts that Durr's conduct was criminal and violative of 42 PA. CONS.STAT.ANN. § 8309. (Compl. ¶ 33) Pacitti alleges that Durr engaged in the course of conduct with malicious intent toward the actual or perceived ancestry of Pacitti. (Compl. ¶ 34) Pacitti claims that he is entitled to damages as established by 42 PA. CONS.STAT.ANN. § 8309.

Under Pennsylvania law, a person commits ethnic intimidation where:

> with malicious intention toward the actual or perceived race, color, religion, national origin, ancestry, mental or physical disability, sexual orientation, gender or gender identity of another individual or group of individuals, he commits an offense under any other provision of this article or under Chapter 33 (relating to arson, criminal mischief and other property destruction) exclusive of section 3307 (relating to institutional vandalism) or under section 3503 (relating to criminal trespass) with respect to such individual

---

[7]The court does not express any opinion about whether Durr is immune from liability for either defamation or invasion of privacy. Because the court finds that no reasonable finder of fact could render a verdict for Pacitti on the defamation or invasion of privacy claim, the court need not reach the issue of Durr's asserted immunity.

> or his or her property or with respect to one or more members of
> such group or to their property.

18 PA. CONS. STAT. ANN. § 2710. An individual who suffers harm as a result of a violation of

section 2710 may pursue the wrongdoer pursuant to 42 PA. CONS. STAT. ANN. § 8309. Section

8309 provides:

> a person who incurs injury to his person or damage or loss to his property as a
> result of conduct described in 18 Pa.C.S. § 2710 (relating to ethnic intimidation)
> or 3307 (relating to institutional vandalism) shall have a right of action against the
> actor for injunction, damages or other appropriate civil or equitable relief.

42 PA. CONS. STAT. ANN. § 8309. Under section 8309 the conduct described in 18 PA. CONS.

STAT. ANN. § 2710, relating to ethnic intimidation, may result in civil liability. The law is well

settled that a plaintiff may only succeed in a civil action based upon ethnic intimidation where

there is a valid civil or criminal wrong alleged. See Warren v. Township of Derry, 2007 WL

870115 (M.D.Pa. Mar. 20, 2007); Warren v. Township of Derry, 2005 WL 1154759 (M.D.Pa..

May 2, 2005); Gonzalez v. City of Bethlehem, 1993 WL 276977 (E.D.Pa. Jul. 13, 1993);

Pennsylvania v. Robinson, 936 A.2d 107 (Pa.Super.Ct. 2007); Pennsylvania v. Austin, 906 A.2d

1213 (Pa.Super.Ct. 2005); Pennsylvania  v. Burlingame, 672 A.2d 813 (Pa.Super.Ct. 1996).

Here, Pacitti claims that Durr committed an offense contemplated by section 2710 where

he engaged in a course of harassment over a period of twenty-four months. Under Pennsylvania

law, a person commits the crime of harassment when, with intent to harass, annoy or alarm

another, the person:

> (1) strikes, shoves, kicks or otherwise subjects the other person to physical
> contact, or attempts or threatens to do the same;
> (2) follows the other person in or about a public place or places;

(3) engages in a course of conduct or repeatedly commits acts which serve no legitimate purpose; ...

18.Pa. Cons. Stat Ann. § 2709.  In order to establish a valid claim of harassment under Pennsylvania law, the only element possibly relevant to this case is whether a defendant's actions "had no legitimate purpose." <u>Pennsylvania v. Reese</u>, 725 A.2d 190, 191 (Pa.Super.Ct. 1999); <u>Pennsylvania v. Urrutia</u>, 653 A.2d 706, 709 n. 5 (Pa.Super.Ct.1995).

In the instant case, Pacitti failed to adduce sufficient evidence for a reasonable jury to conclude that Durr's actions held no legitimate purpose.  Indeed, this court addressed at length Durr's actions in issue related to his position as president of the board of directors and chief executive officer of the Association.  Durr sought to make sure that Pacitti, and other owners, followed Seapointe rules and regulations  Furthermore, and as discussed at length above, Pacitti does not have a viable claim for either defamation or invasion of privacy.  In the absence of proof of either a viable criminal or civil action, Pacitti's claim of ethnic intimation under section 8309 cannot survive.  Accordingly, the court will grant defendant's motion for summary judgment with respect to this claim.[8]

## Conclusion

_____

[8]This court's finding does not address the merits of Pacitti's argument that Durr's alleged repeated verbal attacks against individuals of Italian decent are sufficient to maintain an action for ethnic intimidation.  As this court has found that Pacitti has no viable civil action, his claims for ethnic intimidation and civil rights violations must be dismissed.  Although this court finds that the alleged statements relating to Pacitti's Italian ancestry are vile, offensive and reprehensible, the court need not reach the merits of Pacitti's arguments with respect to those allegations because he failed to meet the threshold requirement with respect to adducing sufficient evidence to prove an underlying civil or criminal wrong.

After reviewing the undisputed material facts of record, viewing all disputed facts in the light favorable to the nonmoving party, and drawing all reasonable inferences in favor of the nonmoving party, the motion for summary judgment filed by defendant Durr (Doc. No. 77) will be **GRANTED**. The court concludes that plaintiff Pacitti did not adduce sufficient evidence for a reasonable jury to render a verdict in his favor with respect to his claim for defamation, invasion of privacy or ethnic intimidation (civil rights violation) and, therefore, defendant's motion summary judgment with respect to those claims will be **GRANTED**.

The court concludes that plaintiff Cinquegrana failed to adduce sufficient evidence for a reasonable jury to render a verdict in his favor with respect to his defamation claim and, therefore, defendant's motion for summary judgment with respect to that claim will be **GRANTED**.

The clerk shall mark this case closed.

By the court:


/s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge

Dated: March 24, 2008

cc:    Counsel of record